IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 3:23-CR-30030-NJR-1 |
| MICHAEL T. SCOTT, | |
| Defendant. | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is a Motion to Suppress Evidence filed by Defendant Michael Scott. (Doc. 23). Scott is charged with one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g) and 924(a)(2). (Doc. 1). Scott now seeks to suppress a Glock 22 handgun and drum magazine that were seized during what he claims was an illegal impoundment and inventory search of his vehicle. (*Id.*). The Government opposes the motion. (Doc. 27).

### BACKGROUND

The following facts are established by the dashcam video submitted by Scott as evidence in support of his motion to suppress. (Doc. 23-1).

Trooper L. Wells with the Illinois State Police ("ISP") was on patrol when he passed a black Dodge Avenger driving without a front license plate. (*Id.* at 0:01-0:02). Trooper Wells turned around and followed the car into a CVS parking lot. (*Id.* at 1:00-1:14). The driver exited the vehicle and headed toward the CVS entry when Trooper Wells asked the man to get back into his car. (*Id.* at 1:15-1:22). The man, who we now know to

be Michael Scott, did not get back into the car, but rather paced around the driver's side of the vehicle while Trooper Wells called in the stop. (*Id.* at 1:23-1:54).

Trooper Wells explained that he was with the ISP and that he stopped Scott because his vehicle did not have a front license plate. (*Id.* at 1:58). Scott told Trooper Wells it was his girlfriend's car. (*Id.* at 2:00). When Trooper Wells asked Scott if he had his driver's license and insurance card, Scott said, "no sir, it's right down the street." (*Id.* at 2:05). Scott also did not have an ID card on him. (*Id.* at 2:14). Scott asked if he could call his girlfriend, but Trooper Wells assured him it was just an equipment violation. (*Id.* at 2:22). Trooper Wells then asked Scott for his name, and Scott gave the false name of Steven B. Love. (*Id.* at 2:24-2:50). When Trooper Wells asked Scott how to spell "Steven," Scott initially seemed confused until Trooper Wells informed Scott there are multiple ways to spell Steven. (*Id.*). Scott then said "oh yeah, S-t-e-v-e-n." (*Id.*).

Scott again asked if he could call his girlfriend, and Trooper Wells told him "yeah, here in a minute." (*Id.* at 3:00-3:04). Trooper Wells looked inside the front driver side and rear doors of the vehicle as he returned to his police car. (*Id.* at 3:15). Scott asked Trooper Wells again to let him call his girlfriend, and Trooper Wells said he first had to find out what was going on with Scott's license. (*Id.* at 3:20).

Trooper Wells proceeded to use his computer system to determine whether Steven B. Love had a valid driver's license or any active warrants while Scott continued to pace along the side of his vehicle. (*Id.* at 3:25-4:16). When Trooper Wells returned, he asked Scott what his real name was, and Scott again said, "Steven Love." (*Id.* at 4:28). Trooper Wells then handcuffed Scott because, he explained, he was not getting any return on that

name. (*Id.* at 4:30). Scott then said his name was Steven Brandon Love from St. Louis, Missouri. (*Id.* at 4:31). Trooper Wells told Scott he was being detained in the back of his patrol car based on Scott's behavior and until Trooper Wells could get something back on his name. (*Id.* at 4:46). Trooper Wells explained that it was nothing against him, but Scott had no ID on him, Trooper Wells was unable to get any information on the name Scott gave, and Scott stumbled when asked what his name was. (*Id.* at 4:46-5:28). Trooper Wells asked Scott, "is that your real name then?" Rather than respond to the question, Scott said: "I just don't understand what's going on." (*Id.* at 5:38). Trooper Wells said he would try his name in Missouri. (*Id.* at 5:40). He also asked Scott for his social security number, but Scott said he didn't know it. (*Id.* at 6:04). Trooper Wells told Scott he was playing games with him, which he did not appreciate. (*Id.* at 6:11).

Trooper Wells attempted to locate Steven B. Love from St. Louis, Missouri, with the birthdate given by Scott. Scott eventually admitted he (as Steven B. Love) never had a driver's license. (*Id.* at 11:45). Trooper Wells then asked if he could search the glove box for insurance information, and Scott said, "I think she has everything with her. Can I call her please?" (*Id.* at 12:01). Trooper Wells tell him, "here in a minute." (*Id.* at 12:04).

Trooper Wells then proceeded to search the driver's side of the vehicle, where he found a Glock 22 loaded with a magazine containing 15 rounds of .40 caliber ammunition under the driver's seat. (*Id.* at 13:45). He also located a drum magazine loaded with 35 rounds of .40 caliber ammunition and a tax document containing the name "Michael T. Scott." (*Id.* at 13:51-20:28). Trooper Wells made a phone call to inquire about a potential federal prosecution for the firearm and told the person he was speaking to:

> So I was going to go have him sit back in the car but I wanted to make sure just based on his behaviors there were no weapons or anything so whenever I go back in the seat he's got a loaded gun under his driver's seat and he's also got a drum mag.

(*Id.* at 21:00-21:16).

Trooper Wells continued to try to obtain confirmation about Steven B. Love's criminal history and identity. (*Id.* at 22:00-33:19). Upon performing a pat-down search of Scott, Trooper Wells found a photo ID for "Michael T. Scott," which Scott previously denied possessing. (33:51-34:57). Trooper Wells moved Scott to the front seat of the patrol car and gave Scott his *Miranda* warnings. (*Id.* at 34:50-35:00). Scott indicated he did not want to say anything without a lawyer. (*Id.* at 42:30).

Upon running Scott's real name, Trooper Wells discovered Scott had a suspended Missouri driver's license, a prior felony conviction, and an active felony warrant out of Clinton County, Illinois. (*Id.* at 37:00-43:46). He indicated to another officer that the car would be towed and Scott would be taken to the county jail. (*Id.* at 45:30-45:40).

### EVIDENTIARY HEARING

"District courts are required to conduct evidentiary hearings only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion." *United States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011). "To obtain an evidentiary hearing, the defendant 'bears the burden of making a prima facie showing of illegality.'" *United States v. Chavez*, 625 F. Supp. 3d 760, 768 (N.D. Ill. 2022) (quoting *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992)).

Here, Scott requests an evidentiary hearing, at which his girlfriend would testify

that she is the registered owner of the vehicle and authorized Scott to drive it. She would further testify that she lives a short distance from the CVS and would have been able to arrange for the car to be towed if officers would not permit her to drive it. The Government, on the other hand, asserts that Scott's motion to suppress can be decided without an evidentiary hearing because Scott has raised no significant factual dispute.

The Court agrees with the Government and finds that no hearing is necessary to dispose of the motion, as the proffered testimony from Scott's girlfriend has no bearing on any material facts. The Court was provided with video evidence of all events, with the exception of seeing the Dodge Avenger being towed. Furthermore, Scott has not disputed any material facts set forth in the ISP Tow Report (Doc. 27-3) or the ISP Evidence Inventory and Receipt (Doc 27-4).

## DISCUSSION

The Fourth Amendment establishes "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[T]he ultimate touchstone of the Fourth Amendment is reasonableness," which is "measured in objective terms by examining the totality of the circumstances." *United States v. Yang*, 39 F.4th 893, 899 (7th Cir. 2022), *cert. denied*, 214 L. Ed. 2d 454, 143 S. Ct. 754 (2023) (quoting *United States v. Price*, 28 F.4th 739, 748 (7th Cir. 2022) and *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021) (en banc)).

Because a traffic stop is a seizure, it must be "reasonable under the circumstances." *Id.* The Supreme Court has held that a routine traffic stop is a "relatively brief encounter" and, thus, is "more analogous to a so-called '*Terry* stop' . . . than to a formal arrest."

*Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (quoting *Knowles v. Iowa*, 525 U.S. 113, 117 (1998)). As such, an officer need only have a "reasonable suspicion of a traffic violation—not probable cause." *Cole*, 21 F.4th at 427 (citing *Rodriguez*, 575 U.S. at 354).

Scott does not dispute that Trooper Wells had reasonable suspicion to conduct a traffic stop, as the video evidence shows Scott driving past Trooper Wells with no front license plate on his vehicle. (Doc. 23-1 at 0:01-0:02). Instead, Scott claims that Trooper Wells conducted an inventory search of the vehicle without probable cause when Scott was not under arrest and the vehicle was not lawfully impounded. Thus, the fruits of the illegal search must be suppressed.

### A.     Inventory Search

Inventory searches are an exception to the warrant requirement and are reasonable under the Fourth Amendment. *United States v. Cartwright*, 630 F.3d 610, 613 (7th Cir. 2010) (citing *South Dakota v. Opperman*, 428 U.S. 364, 376 (1976)). Police may inventory and secure the contents of an impounded vehicle to protect themselves from dangers, protect the owner's property while it is in police custody, and prevent claims that the police lost or damaged an owner's property. *Id.* at 613-14.

"An inventory search is lawful if (1) the individual whose possession is to be searched has been lawfully arrested, and (2) the search is conducted as part of the routine procedure incident to incarcerating an arrested person and in accordance with established inventory procedures." *Id.* at 614 (citing *United States v. Jackson*, 189 F.3d 502, 508–09 (7th Cir. 1999)).

i.  *Whether Scott Was Lawfully Arrested*

Scott argues that he was not lawfully arrested but, instead, was merely detained pending further investigation of his name. Trooper Wells indicated as much, Scott argues, when he put Scott in handcuffs "for right now" because he wasn't getting anything back on the name "Steven B. Love." (Doc. 23-1 at 4:24-4:32). Trooper Wells further told Scott that if he could get something back on his name when he searched in Missouri, "these come right off." (*Id.* at 4:45-4:46). Because Scott was not under arrest at the time of the search, he argues, Trooper Wells could not have conducted a lawful inventory search.

"A suspect is under custodial arrest when 'a reasonable person in the suspect's position would have understood the situation to constitute a restraint of freedom of movement of the degree which the law associates with formal arrest.'" *Ochana v. Flores*, 347 F.3d 266, 270 (7th Cir. 2003) (quoting *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999)). "To determine if a seizure, including an arrest, has occurred, courts engage in an objective inquiry that presupposes an innocent person." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 719 (7th Cir. 2013).

Here, Scott was handcuffed and Trooper Wells conducted a pat-down search before placing Scott in the back of his police car. A reasonable person in Scott's position would have understood that his freedom was restrained and he could not leave. Although Trooper Wells told Scott he was just being "detained" while he attempted to look up Scott's identity, the Seventh Circuit has held that an officer's choice to label the arrest a "detention" rather than "arrest" does not matter for purposes of the Fourth Amendment. *United States v. Jackson*, 377 F.3d 715, 717 (7th Cir. 2004) ("It does not matter

. . . what label the officer applied at the scene; analysis under the fourth amendment is objective . . . ."); *see also Abbott*, 705 F.3d at 714 ("the officer's subjective state of mind and beliefs are irrelevant").

In *Jackson*, the defendant failed to produce a driver's license, and information from the police database "raised doubts about his identity." *Id.* The Seventh Circuit Court of Appeals stated that, "[o]nce Jackson failed to produce a driver's license, the police could not put him back in the car and watch him motor off." *Id.* The court noted that Jackson "could have been a fugitive. . . . Such a person might claim, as Jackson did, not to be carrying a driver's license or other document that revealed his identity." *Id.* While the police told Jackson he was not "under arrest" but was just being "detained" pending investigation of his identity, the court found there was probable cause to believe that Jackson had committed a crime, and he was reasonably taken into custody. *Id.*

In this case, Trooper Wells had probable cause to arrest Scott when Scott failed to produce a driver's license, failed to provide proof of insurance, and provided a false name. *See* 625 ILCS 5/6-112 (driver's license shall be displayed upon demand by police); 625 ILCS 5/3-707 (failure to display proof of insurance on demand deemed operating an uninsured motor vehicle); *O'Brien v. City of Chicago*, No. 20 CV 2260, 2023 WL 3947940, at *4 (N.D. Ill. June 12, 2023) (officers had probable cause to arrest defendant who refused to produce driver's license and proof of insurance); *Lanigan v. Vill. of E. Hazel Crest, Ill.*, 110 F.3d 467, 474 (7th Cir. 1997) (Illinois law authorizes officers to arrest an individual for driving without a license). The fact that Trooper Wells told Scott he was being detained as opposed to arrested is irrelevant for the purposes of the Fourth Amendment analysis.

*Jackson*, 377 F.3d at 717.

Moreover, as argued by the Government, Trooper Wells not only had probable cause to arrest Scott for failure to provide a driver's license and proof of insurance, but he also observed that Scott was nervous, was pacing alongside his car, stumbled when asked what his name was, and could not provide his social security number. Finally, as Scott sat handcuffed in the back of the police vehicle, he falsely stated that "Steven Love" has never had a driver's license, and that is why Trooper Wells could not find his name in his computer database. From these undisputed facts, the Court concludes Trooper Wells had probable cause under Illinois law to arrest Scott for driving without a license, failure to produce proof of insurance, and for providing a false identification, and that Scott was lawfully under arrest.

        ii.    *Whether Trooper Wells Followed Established Inventory Procedures*

Scott also argues that Illinois state law does not permit officers to have unlimited tow and impound authority, and no circumstances existed under which Trooper Wells could legally impound the vehicle Scott was driving. Much of Scott's argument is premised on the idea that he was not under custodial arrest. Having found that he was, however, the Court turns to the ISP Tow Policy, which the Government provided an exhibit. (Doc. 27-1).

The policy states, in relevant part, "The Illinois State Police (ISP) will use tow services for removing: 1.A Vehicles/boats pursuant to a custodial arrest." (*Id.* at p. 1). The policy further requires that the officer fill out a Tow Report at the scene of the tow and examine and inventory the contents of the vehicle. (*Id.* at pp. 1, 2). The examination and

inventory is limited to those areas of the vehicle where an owner or operator would ordinarily place or store property, including the front and rear seat areas, the glove compartment, sun visors, and trunk and engine compartments. (*Id.* at p. 2).

Trooper Wells followed the ISP Tow Policy when he examined and inventoried the contents of the vehicle pursuant to Scott's custodial arrest. Trooper Wells filled out the Tow Report and listing the inventory of the vehicle as papers, cell phones, car seat, and other miscellaneous items. (Doc. 27-3). He also completed an ISP Evidence Inventory and Receipt, which listed the Glock 22, the Glock magazine containing ammunition, and the Glock drum-style magazine containing ammunition. (Doc. 27-4).

Scott acknowledges that the ISP Tow Policy allows the ISP to tow a vehicle pursuant to custodial arrest, but he asserts the policy also states that the "owner or operator" may choose the tow service so long as there is no "undue delay." (Doc. 27-1 at p. 5). Scott makes no argument that this deprivation violated his Fourth Amendment rights, however, and he does not suggest that he would have chosen a tow service if given the opportunity. Nor did the failure to offer Scott the opportunity to call a tow company violate the Constitution. *See United States v. Cherry*, 436 F.3d 769, 775 (7th Cir. 2006) ("[E]ven if events conspired to deprive Cherry of the opportunity to request a specific towing company, no Fourth Amendment violation has occurred; the police were free to tow his hazardously parked car pursuant to their standard policy."). While the police here were not dealing with a hazardously parked vehicle, they were entitled to tow the car pursuant to Scott's custodial arrest.

Scott also argues that, to the extent the policy authorizes a blanket tow authority

for any and all custodial arrests, regardless of the specific circumstances, the policy violates the Illinois Vehicle Code and the Fourth Amendment. Scott submits that officers should be required to consider circumstances including the traffic and/or safety risk posed by the car, the time of day, and whether someone can pick up the car in a timely manner. And, in his case, the vehicle was legally parked in a CVS parking lot where it was not a safety risk or traffic hazard, and his girlfriend could have picked up the car.

Scott's argument fails because the vehicle lacked a front license plate, meaning no one could legally drive the car, including his girlfriend. Moreover, "[t]he Fourth Amendment does not require that the police offer these sorts of alternatives to impoundment." *Cartwright*, 630 F.3d at 615 (citing *Colorado v. Bertine*, 479 U.S. 367, 373–74 (1987) (holding that the police need not give a motorist "an opportunity to make alternative arrangements" that avoid impound and inventory); *United States v. Clinton*, 591 F.3d 968, 972 (7th Cir. 2010) ("That Clinton's girlfriend, the owner of the car, could have been called to take possession of the car, is irrelevant."); *Cherry*, 436 F.3d at 775 (stating that officers need not invite or accept input from the motorist as to the appropriate disposition of his vehicle, and the Fourth Amendment does not "demand that police offer a motorist an alternative means of removing his vehicle that will avoid the need to tow it and conduct an inventory search")).

Finally, Scott asserts that Trooper Wells' actions demonstrate that his so-called inventory search was actually pretext for general rummaging and investigation. Scott points to the phone call where Trooper Wells states that he planned to have Scott sit in the Dodge Avenger, but "I wanted to make sure just based on his behaviors there were

no weapons or anything." Scott argues that Trooper Wells' statement indicated he was concerned about officer safety and did plan to tow the vehicle at the time of the search.

It is true that an "inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990). "The policy or practice governing inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime.'" *Id.* (quoting *Colorado v. Bertine*, 479 U.S. 367, 376 (1987)). That is why officers must conduct the inventory search pursuant to an established procedure; "[r]equiring sufficient regulation of inventory searches ensures that a police procedure is not merely a pretext for concealing an investigatory police motive." *United States v. Lomeli*, 76 F.3d 146, 148 (7th Cir. 1996) (citing *South Dakota v. Opperman*, 428 U.S. 364, 376 (1976)).

At the same time, "[t]he fact that an inventory search may also have had an investigatory motive does not invalidate it." *Id.*; *United States v. Metts*, No. 3:21-CR-91 DRL-MGG, 2022 WL 1421370, at *6 (N.D. Ind. May 4, 2022). Furthermore, one of the purposes of an inventory search is to protect police from dangers, so even if Trooper Wells was concerned about the presence of a weapon, that does not invalidate the inventory search. *See Cartwright*, 630 F.3d at 613.

The Seventh Circuit has held that an inventory search is valid if the owner or operator of the vehicle has been lawfully arrested and the search is conducted pursuant to established inventory procedures. *Cartwright*, 630 F.3d at 614. Scott cites to no Seventh Circuit cases holding otherwise. Because Scott was lawfully arrested at the time of the

inventory search, which was done pursuant to the ISP's well-established Tow Policy, the Court finds that Scott's motion to suppress must be denied.

## Conclusion

For these reasons, the Court **DENIES** the Motion to Suppress Evidence (Doc. 23) filed by Defendant Michael Scott.

**IT IS SO ORDERED.**

DATED:   October 24, 2023

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**